# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 56946-9-II |
| KENNETH ZIMMERMAN, | UNPUBLISHED OPINION |
| Petitioner. | |

MAXA, J. – Kenneth Zimmerman seeks relief following his February 2018 convictions of attempted second degree child rape and four counts of felony communication with a minor for immoral purposes (CMIP). Zimmerman's convictions arose from a sting operation involving the Washington State Patrol (WSP). Zimmerman posted an ad on a website looking for a young little girl for play. A law enforcement officer responded to the ad posing as a 13-year-old girl, and Zimmerman exchanged multiple emails and text messages of a sexual nature with the fictional girl. He was arrested after he drove near an address the girl had provided.

In his personal restraint petition (PRP), Zimmerman argues that (1) he received ineffective assistance of trial counsel because his defense counsel, Barbara Corey, failed to (a) notify him of a plea offer, (b) adequately evaluate the plea offer and advise him of the likelihood of a conviction, (c) adequately pursue plea negotiations, (d) advise him of the potential sentencing consequences, and (e) object to the amendment of the information on vindictive prosecution grounds; (2) his due process rights were violated by outrageous government

misconduct; (3) the trial court erred when it refused to instruct the jury on entrapment; (4) he received ineffective assistance of appellate counsel because appellate counsel failed to raise the ineffective assistance of trial counsel and double jeopardy issues; and (5) his four felony CMIP convictions violate double jeopardy because his multiple communications with the fictional minor represented a single unit of prosecution.

In June 2023, we remanded this PRP for a reference hearing on the first and second ineffective assistance of counsel claims – whether Corey failed to notify Zimmerman of a plea offer and, if she communicated the plea offer, whether she adequately advised him of the risks of proceeding to trial. Following the reference hearing, the superior court found that (1) Corey notified Zimmerman of the plea offer at issue, but (2) she did not properly evaluate the plea offer after the denial of "half-time" defense motions after the State rested. The superior court declined to find whether defense counsel was ineffective in downplaying the chance of conviction before the State rested.

Zimmerman now challenges the superior court's finding that Corey notified him of the plea offer at issue. And the State challenges the superior court's finding that Corey did not properly advise Zimmerman after the State rested.

We hold that (1) Zimmerman's ineffective assistance of counsel claim based on Corey's alleged failure to inform him of the plea offer fails; (2) whether Corey adequately evaluated the plea offer after the half-time defense motions were denied is immaterial because the plea offer no longer was available after the State rested; (3) Zimmerman's other ineffective assistance of trial counsel claims fail; (4) Zimmerman's outrageous government misconduct claim fails; (5) the entrapment issue was raised and addressed on the merits in Zimmerman's direct appeal, and therefore will not be considered in this PRP; (6) Zimmerman's ineffective assistance of appellate

counsel claim fails, and (7) Zimmerman's four felony CMIP convictions do not violate the

prohibition against double jeopardy because the separate engagements with the fictional girl

constituted multiple units of prosecution.

Accordingly, we deny Zimmerman's PRP.

FACTS

*Sting Operation*

A summary of the facts of this case was set out in Zimmerman's direct appeal:

In December 2015, Zimmerman was arrested as the result of an undercover operation initiated by the Washington State Patrol Missing and Exploited Children Task Force [(MECTF)].[1] As part of this operation, Detective Jeff Bickford posed as a 13-year-old girl named "Kaylee" and responded to ads on Craigslist. Detective Bickford's purpose was to "identify persons that were interested in engaging in sexual activity with children."

Detective Bickford found an ad posted by Zimmerman, entitled "looking for young little girl – m4w." The ad stated:

Hello, I am looking for a young little girl for play. Looking for open minded and obedient. Looking to [sic] pleased abs [sic] be pleased. Please tell me about you and include a picture. Looking for kinky fun. Put your favorite color in the subject line.

On December 14, 2015, Detective Bickford responded to Zimmerman's ad via e-mail, writing, "im totally bored…what kinda play r u into?" Zimmerman responded, "Hello, I am b very open in play. I am a Dom. I like bdsm, dirty talk, pda and whatever you like. My name is Ken. Hit me up let's text a little and go from there." Zimmerman then provided his telephone number. Detective Bickford replied, "i don't no what ur talking about . . . im almost 14 but act way older . . . I nvr herd of that stuff though." In response, Zimmerman asked ["Kaylee" what she was "looking for" and] for pictures, and [, after several requests,] Detective Bickford sent him an age-regressed photo of a female detective and a telephone number to text [the following day.] Zimmerman responded, "Pretty picture, where are you from you said you just moved here? You should be in school what school do you go to? It was very important question are you affiliated in any way with law enforcement?" Detective Bickford replied, "i don't go to skoool here yet . . . what does affiliat mean?"

---

[1] This operation was also known as a Net Nanny operation.

After a few more e-mails, Zimmerman started texting Detective Bickford and, over the course of three days, the two exchanged 364 text messages. On December 15, 2015, Zimmerman (1) asked for pictures of "Kaylee" multiple times; (2) asked whether she had ever had sex; (3) asked why she was interested in someone older; (4) asked whether she wanted to meet up either that day or the following day; (5) asked about her mom and dad; and (6) inquired into why "a pretty girl like [her] doesn't have any boyfriends."

On December 16, 2015, Zimmerman (1) asked for a "sexy pic" of "Kaylee" and that she "show [her] tits"; (2) asked for "sexy pictures" with her "shirt off"; (3) expressed that he wanted to see "Kaylee" the following day; (4) stated that she would be "a little young to be [his] date" to a Christmas function [that he had to attend that evening]; (5) asked about "Kaylee's" weight and size; (6) asked whether "Kaylee" had "ever put [her] mouth on a cock before" and "how many"; and (7) stated that he could "come over tomorrow around 6."

On December 17, 2015, Zimmerman (1) asked whether "Kaylee's" dad was home; (2) inquired into what she was "going to wear for [him]"; (3) asked whether "Kaylee" "shave[d] down in [her] vagina area"; (4) suggested that sex with him may hurt because she is "not use[d] to it"; (5) asked whether "Kaylee" "use[d] a vibrator or fingers on [her]self"; and (6) stated that he was "fixed" and "disease free" and, therefore, did not need a condom.

That same day, Zimmerman also asked "Kaylee" for her address. Detective Bickford responded, stating that "Kaylee" lived "in a hill by the hospital" and by "the chickn plce call[ed] . . . ezls" near "the hospital." At 7:10 p.m., Zimmerman texted "Kaylee" that he was about 15 minutes away from her location. Zimmerman drove from a Fred Meyer store near Cheney Stadium to the Hilltop neighborhood of Tacoma where Saint Joseph's Medical Center is located.

At 7:33 p.m., Zimmerman texted that he was "already up by the hospital." Over the next hour, Zimmerman described his activity as he was searching for "Kaylee's" house. He texted that a guy stopped him "wanting to know what [he] was doing in [the] neighborhood," that he had "been hanging out down here for an hour [and] people ha[d] seen [his] car," that "[t]here [were] black guys all over the place [and] cars around here circling," and that "[t]hey've seen [him] several times and stop [him]." Detective Bickford texted Zimmerman the address for a trap house, which was a house associated with the undercover police operation and located by Saint Joseph's Medical Center.

At 8:31 p.m., Zimmerman asked "Kaylee" to "walk up to the emergency entrance to the hospital parking lot and . . . meet [him] there" because he "[felt] safer doing that." Around 8:30 p.m., police observed Zimmerman's car in the emergency room parking lot of St. Joseph's Medical Center. Zimmerman then drove past the trap house and appeared to be leaving the area. At 8:38 p.m., police arrested Zimmerman.

Pursuant to a search warrant for Zimmerman's cell phone, the police found e-mails and text messages sent to "Kaylee," the photographs sent by Detective Bickford, Internet searches to the Craigslist ad, "looking for young little girl – m4w," and Internet searches for the location of Ezell's Chicken and the address of the trap house.

*State v. Zimmerman*, No. 81032-4-I, slip op. at 2-5 (2020), http://www.courts.wa.gov/opinions/pdf/810324.pdf (original footnotes omitted).

*Charges and Initial Plea Offers*

The State charged Zimmerman with attempted second degree child rape. Zimmerman retained Leslie Tolzin as his attorney.

In January 2016, prosecutor Neil Horibe made a plea offer that required Zimmerman to enter a factual plea to the original charge of attempted second degree child rape. The State then would recommend a standard range indeterminate sentence of 58.5 to 76.5 months to life with lifetime community custody and a sex offender registration requirement. Zimmerman did not accept this offer.

In July 2016, prosecutor John Neeb conveyed a second plea offer. This offer required Zimmerman to plead guilty to amended charges of two counts of attempted second degree child molestation and one count of felony CMIP. In exchange, the State would agree to a joint sentencing recommendation of concurrent sentences of 60 months on each second degree child molestation charge and 29 months on the CMIP charge. Neeb's emailed offer also listed the plea offers for nine other defendants who had been charged as a result of the same undercover operation.

In September 2016, Tolzin withdrew as Zimmerman's counsel. Phillip Thornton substituted as defense counsel. According to Zimmerman, Tolzin was actively attempting to

negotiate a better plea deal when he withdrew, and Zimmerman asserts that he was willing to take a plea offer at this point.

Five days after Thornton appeared as defense counsel, Neeb forwarded to him the email setting out the second plea offer. Neeb advised Thornton that he had told Tolzin "some time ago that [he] intended to add three Felony [CMIP] counts in this case" based on Zimmerman's contacts with "Kaylee" on December 15, 16, and 17, 2015. Resp., App. at 66. Neeb noted that he had stated from the beginning that Zimmerman would face the additional CMIP charges if the case did not resolve.

Ten days later, Neeb emailed Thornton to advise him that the second plea offer would expire on October 10, and that any negotiation had to occur before then. Neeb stated that if Zimmerman did not accept the second plea offer, Neeb intended to amend the charges and that he would file one or more counts of felony CMIP against Zimmerman on the first court date after October 10. There is nothing in the record regarding whether Thornton responded before the October 10 deadline.

*Representation by Barbara Corey and Third Plea Offer*

According to Zimmerman, in October he became dissatisfied with Thornton's representation. Zimmerman met with attorney Barbara Corey, who assured him that there was no basis for the charges and that she could either get the case dismissed or a plea offer for a misdemeanor offense. In January 2017, Thornton officially withdrew as defense counsel and Corey substituted as counsel.

Three days later, Neeb emailed Corey a copy of the amended information that he intended to file on the upcoming March 2017 trial date. The amended information charged Zimmerman with attempted second degree child rape and four counts of felony CMIP. The four

6

CMIP charges were alleged to have occurred on December 14, 15, 16, and 17 respectively. In his email, Neeb also stated, "I am not unwilling to negotiate this case with you, but I am not currently inclined to significantly amend my previous offer." Resp., App. at 76.

On March 22, Corey sent a lengthy letter to Neeb, Pierce County Prosecutor Mark Lindquist, and chief criminal deputy prosecutor Kathleen Proctor discussing Zimmerman's case. She stated that Zimmerman would be willing to entertain a plea to one count of CMIP with credit for time served. Corey stated that Zimmerman's case was the last unresolved case arising from the sting operation and asserted that it was factually distinct from the other cases. She also outlined the motions that she planned to file, asserted that the probable cause statement contained false statements regarding the location of Zimmerman's arrest in relation to "Kaylee's" residence, and asserted that Zimmerman had a viable entrapment defense.

Two days later, Corey emailed Zimmerman and informed him that after she met with Neeb's supervisors, she expected that the State would make another plea offer. Sometime before May 3, Corey met with Lindquist and Proctor to discuss a possible plea. According to Zimmerman, after the meeting Corey advised him that she had met with Lindquist and Proctor without Neeb and that they had agreed that a plea offer for a misdemeanor without any jail time would properly resolve the case. Zimmerman asserts that Corey advised him that Lindquist and Proctor planned to discuss this with Neeb and that Corey believed Neeb would now cooperate because of his supervisors' perspective on the case.

At some point after this meeting, Neeb apparently made a third plea offer. The third offer was for Zimmerman to plead guilty to three counts of felony CMIP with a resulting range of 22 to 29 months in prison. Zimmerman claims that he was not aware of the terms of the third offer until the State's response to his PRP.

7

On May 3, Proctor wrote to Corey and advised her that she and Lindquist had discussed the case with Neeb. Proctor stated that Corey had been seeking a plea similar to another defendant's plea to two counts of felony CMIP, with an agreement that the State recommend 12 months of confinement and other conditions. Proctor informed Corey that after evaluating the case and comparing it to the other cases arising from the sting operation, she and Lindquist found it more similar to cases in which the defendants received sentences of 24 or 48 months.

Proctor further stated that Neeb had informed them that he recently had extended a third plea offer with a sentence comparable to the sentence received by the other defendant who received a sentence of 24 months. Proctor understood that the third offer would be open until May 12. In light of the third offer, Lindquist and Proctor did not see a reason to intercede in any ongoing negotiations.

According to Zimmerman, Corey then informed him that Neeb would not agree to a misdemeanor plea deal and that he had made a third offer. However, he claims that Corey did not tell him the terms of the third offer. Instead, Zimmerman asserts that Corey told him that it was a bad deal and was not worth serious consideration and that she planned to teach Neeb a lesson.

Zimmerman claims that Corey did not engage in any further plea negotiations. Instead, Corey assured him that they would prevail at trial and that, if he was convicted, his longest potential sentence would be 7 to 10 years. Zimmerman asserts that by the time of the sentencing hearing, Corey admitted that she had not yet calculated his sentence.

*Pretrial Proceedings and Trial*

In May 2017, Zimmerman filed a motion to dismiss based on outrageous government misconduct. Although Zimmerman's motion purported to move to dismiss only the attempted

8

second degree child rape charge, when the motion was heard Zimmerman argued that the entire case should be dismissed for government misconduct. The trial court orally denied the motion to dismiss at the beginning of the trial. The court later issued written findings to support the denial of the motion to dismiss.

On August 18, Corey and Zimmerman appeared for a trial readiness hearing. At the hearing, Neeb stated that Corey had sought a plea bargain with Lindquist and Proctor and "she was told that the State's offer was not going to get any better." Resp., App. at 151. But Neeb did not specify the terms of the offer he was referring to or when the offer had been made. The trial court then stated that "the State did indicate that they've made an offer, and the defense has indicated that the defendant has been informed." Resp., App. at 152.

The trial court continued, "And, I take it, that the offer has been declined?" Resp., App. at 152. Corey stated that her understanding was that the offer was open until the following Friday. Neeb responded, "The offer has expired some time ago by its own terms. But if Ms. Corey approaches me between now and the re-arraignment, we can certainly talk about it." Resp., App. at 152. The trial court subsequently entered a trial readiness order stating "[t]he State has made a plea offer" and "[t]he defendant has been informed." Resp., App. at 121 (emphasis added). Zimmerman signed this order.

On October 17, two days before the start of trial, Neeb moved to file the amended information that he had provided to Corey when she took over the case in January, which added four counts of felony CMIP. Neeb stated that the parties had agreed that the motion to amend would be heard when the trial began. Corey agreed that Zimmerman had waived arraignment on the amended information until the day of trial. The trial court allowed the amended information.

Count II concerned Zimmerman's email communications with "Kaylee." Counts III, IV, and V related to Zimmerman's text messages sent on December 15, 16, and 17 respectively.

As noted above, before trial the trial court denied Zimmerman's motion to dismiss the case based on outrageous governmental conduct, which included a claim of entrapment and allegations that the State was pursing unsustainable charges based on perjured statements. The court also denied Zimmerman's motion to dismiss the case based on prosecutorial misconduct premised on the assertion that the prosecutor allegedly adopted false information about where the police arrested Zimmerman in the declaration of probable cause.

The trial started on October 19. The jury heard testimony consistent with the facts set out above. In addition,

> Zimmerman testified that he created the Craigslist ad and sent the e-mails and text messages that were admitted into evidence. He also testified that he drove to the area surrounding Saint Joseph's Medical Center and had no reason to be in that area except to meet "Kaylee." However, Zimmerman denied ever believing that "Kaylee" was a minor and further stated that he never intended to meet or have sexual intercourse with the person he was texting.

*Zimmerman*, slip op. at 5.

During trial, the trial court permitted the State to file a second amended information. The second amended information alleged that the first felony CMIP charge, count II, occurred between December 14 and 16, 2015, and the amendment was intended to conform to the evidence. The remaining counts were not changed. Corey considered this to be a correction of a scrivener's error and did not object. RP 789.

Zimmerman proposed a jury instruction regarding an entrapment defense for the four felony CMIP charges but withdrew the proposed instruction for the attempted second degree child rape charge. The trial court declined to give the entrapment instruction.

10

The jury convicted Zimmerman of attempted second degree child rape and four counts of felony CMIP.

*Sentencing*

On December 3, 2017, in preparation for writing Zimmerman's sentencing memorandum, Corey emailed Neeb and Proctor and inquired as to why, unlike other similar defendants, Zimmerman had not received an offer to plead guilty to second degree child molestation, which would have allowed him to avoid an indeterminate sentence. The next day Neeb responded that before Corey took over the case, he had offered Zimmerman the opportunity to plead to attempted second degree child molestation and one count of felony CMIP.

Neeb also stated that after Corey was retained he made a third offer of three counts of felony CMIP with a resulting range of 22 to 29 months in prison. He stated that he had informed Corey that this was the second most lenient offer in any of the 2015 cases arising from the sting operation.

Corey replied that although she now understood that an offer of second degree child molestation had been communicated to Tolzen in July 2016, neither Tolzen nor Thornton had communicated that offer to Zimmerman. Corey also asserted that this offer was not in the files she received when she took over the case. Corey did not acknowledge having received the third offer.

The trial court sentenced Zimmerman to an indeterminate sentence of 180 months to life for the attempted second degree child rape conviction and to determinate sentences of 29 months on one of the felony CMIP convictions and 60 months on each of the other three felony CMIP convictions. The court also found that two of the CMIP counts were same criminal conduct for purposes of the offender score calculations and ran all of the sentences concurrently.

11

*Direct Appeal and PRP*

Zimmerman appealed his convictions. He asserted several claims, including that the trial court erred when it refused to instruct the jury on the entrapment defense with regard to the four felony CMIP charges. *Zimmerman*, slip op. at 22. Division One of this court affirmed Zimmerman's conviction, rejecting Zimmerman's argument regarding the entrapment instruction. *Zimmerman*, slip op. at 23.

In May 2022, Zimmerman filed this timely PRP. Zimmerman argued that he received ineffective assistance of counsel because Corey failed to advise him of the third offer, misadvised him regarding the likelihood of conviction and the potential sentencing consequences should he go to trial, and failed to adequately pursue plea negotiations. He supported the PRP with his own lengthy declaration regarding the chronology of his case. Because Corey had passed away in 2021, she was not available to submit a declaration regarding Zimmerman's case.

Upon initial consideration of the PRP, we determined that a reference hearing on the ineffective assistance of counsel claim was necessary. We remanded this matter to the superior court to answer three questions:

> 1. Did Corey communicate the terms of the State's third plea offer to Zimmerman?
> 2. If not, would Zimmerman have accepted the plea offer if he had been informed of the terms of the plea offer?
> 3. If Corey did communicate the third plea offer to Zimmerman, did she properly evaluate the evidence against him and advise him of the likelihood of conviction and the potential sentencing consequences?

Ord. for Reference Hr'g at 2 (June 15, 2023).

*Reference Hearing*

At the reference hearing the State's witnesses were Corey's former legal assistant William Dummitt, Neeb, Tolzin, and Thornton. Zimmerman's sole witness was himself.

Dummitt testified that he worked for Corey as a legal assistant for six years and that she represented Zimmerman during this time. Dummitt recalled that Corey met with Zimmerman frequently and that she discussed the strengths of the case and the potential consequences of a conviction with him, as she did with all of her clients. But Dummitt could not recall the details of these discussions. Although Dummitt did not recall the specifics of any plea negotiations and never saw a written plea offer in Zimmerman's case, Dummitt testified that it was Corey's practice to relay all plea offers to her clients.

Neeb testified that he had taken over several cases arising from the WSP sting operation, including Zimmerman's case, in 2016. After reviewing these cases, Neeb sent the July 2016 group email described above that included the second plea offer for Zimmerman. Neeb testified that the email specified that the offer was open for negotiation and that he potentially would add additional charges if no plea deal was reached. Neeb testified that this offer was communicated to both Tolzin and Thornton. But Neeb was told that Zimmerman was not interested in this offer.

Neeb stated that when Corey took over Zimmerman's case there was still time to negotiate a plea, and he communicated the second offer to Corey. But Corey advised him that Zimmerman was not going to accept any plea offer at that time.

Neeb testified that he continued to negotiate Zimmerman's case. And in March 2017, he presented the third plea offer to Corey. He continued to discuss this offer with Corey several times. Neeb stated that Corey repeatedly told him that Zimmerman was only interested in an offer limited to jail time because he did not want to go to prison and because Corey believed that the probable cause statement contained a false statement.

Neeb also asserted that he and Corey continued to discuss the third plea offer during trial until the State rested its case, but Corey always responded that the plea must be limited to jail time. Neeb testified that some of these discussions took place during trial when Corey was sitting next to Zimmerman, that the conversations were loud enough that Zimmerman could hear them, and that he observed Zimmerman reacting to the conversations.

Neeb testified that he believed that all of the cases arising from the sting operation were very strong and that when these cases went to trial the defendants typically were convicted as charged. To Neeb's knowledge, all of the attorneys representing defendants in cases arising from the sting operation were aware of the strength of the cases. But he acknowledged that there were still pretrial motions to be litigated. Regarding Zimmerman's case, Neeb testified that Corey told him that she believed that Zimmerman's pretrial motions would result in a dismissal, so Neeb should either dismiss the case or make a significantly better offer that did not involve any prison time. Neeb testified that Corey persisted in asserting that Zimmerman's motions would result in a dismissal even after Neeb advised her that similar pretrial motions were being denied in other cases.

Tolzin testified that Zimmerman received and was advised of the first and second plea offers and that Zimmerman refused both offers. Zimmerman authorized Tolzin to give a counter offer to the second offer in an effort to get a better deal. RP (Ref. Hrg.) 119. But Tolzin could not recall the specific deal that Zimmerman was seeking, and he was unable to make a counter offer because he ceased representing Zimmerman. RP (Ref. Hrg.) 119, 126, 143.

Tolzin also testified that he believed that the case was defensible and that Zimmerman wanted to avoid a custodial sentence if possible. Tolzin was also aware that Zimmerman wanted to delay trial as long as possible to allow him to assist his ill wife.

14

Tolzin further stated that Zimmerman was well aware that he was facing a potential indeterminate life sentence if he went to trial and that he understood the potential consequences of such a sentence. In addition, Tolzin testified that it was common for clients to change their minds about a plea offer as the case progressed and that counsel's advice about the likelihood of success in the case was something that clients considered. Tolzin was not aware of Neeb's third plea offer, and Tolzin had no idea if Corey received or communicated that offer.

Thornton testified that he represented Zimmerman for a short period of time after Tolzin and that he and Zimmerman only met a few times. When Thornton took over the case, the only plea offer on the table was the second offer. He reviewed the second offer with Zimmerman, but Zimmerman was not interested and did not want to make a counteroffer.

Thornton further testified that at the time of the second plea offer, Zimmerman's primary goal was to continue the trial so he could care for his ill wife and that an offer with any amount of jail time would have been unacceptable to him. When they discussed what kind of plea offer Zimmerman would consider, Zimmerman stated that he would agree to non-sex offense gross misdemeanor with no prison time. In Thornton's opinion this was not a reasonable expectation. No further discussion of plea offers occurred between Thornton and Zimmerman because Corey soon took over the case.

In Thornton's opinion, Zimmerman's case had triable issues, and it would be a difficult case for the State to win due to various possible defenses. But Thornton testified that if he had received a 22 month plea offer, he would have encouraged Zimmerman to accept the offer because of the seriousness of the potential sentencing consequences.

Zimmerman testified that he was out of custody before his trial and that during this time his wife was undergoing cancer treatment. He stated that he had discussed the second plea offer

15

with Tolzin and Thornton and that both attorneys intended to review the results of a recent psychological examination and polygraph and then attempt to negotiate a better plea with the prosecutor. Zimmerman stated that at that time he was interested in a plea and that Tolzin had mentioned that it might be possible to get a plea offer for a misdemeanor offense. Zimmerman denied telling Tolzin that he would only consider pleading to a misdemeanor offense.

Zimmerman further testified that once Corey became his attorney, she assured him that she was familiar with the prosecutor's office and, given the nature of the case, would be able to negotiate a good plea deal. She told Zimmerman that he had a good entrapment argument, the communication with a minor charge would not stick because the minor was fictitious, there were issues with the probable cause statement because it contained false statements, and the State could not prove attempted rape because Zimmerman "never went to the scene." Rep. of Proc. (RP) (Reference Hr'g) at 210-11. Zimmerman stated that Corey also told him that a similar case in Kitsap County had been dismissed.

Zimmerman stated that Corey's opinion was that there was no basis for the prosecution. She asserted that at most the charge should have been a misdemeanor charge and that she was confident that she would be able to meet with Neeb's bosses and obtain a better plea offer that did not require prison time and would allow Zimmerman to remain close to his wife. Zimmerman denied telling Corey that he would only consider plea offers that did not include jail time.

Zimmerman did not recall Corey talking to him about any plea offer involving a sentence of less than 60 months. Although Corey told him that Neeb had made a third offer after the meeting with his supervisors, Zimmerman asserted that Corey said the offer was not worth considering so he assumed it was similar to the second offer. Instead, Corey continued to advise

16

him that she thought he could get a deal for a gross misdemeanor or the case would be dismissed because he had left the area before making contact, there were false statements in the probable cause statement, and there was no actual child involved.

Zimmerman also testified that after Corey's meeting with Neeb's supervisors failed to result in the offer she was seeking, Corey's focus shifted to the trial and she encouraged Zimmerman to go to trial. Zimmerman stated that after this point Corey did not discuss any plea negotiations despite knowing that he was still willing to consider a plea. He asserted that Corey also stated that they should go to trial so they could "teach Neeb a lesson" and that the most Zimmerman could be convicted of was CMIP. RP (Reference Hr'g) at 236.

Zimmerman testified that no one ever informed him of a 22 to 29 month plea offer. And he said that Corey and Neeb never discussed a plea offer in his presence in the courtroom. In fact, Zimmerman asserted that Neeb and Corey barely spoke to each other during the trial.

Zimmerman also denied being advised by any of his counsel that he potentially could go to prison for life. Instead, he asserted that his counsel focused on the standard range that might apply.

Zimmerman testified that a 22 to 29 month offer was a good offer and was one of the lowest he had heard of in any of the cases arising from the sting operation. He testified that if he had received a 22 month offer that required him to plead guilty to three counts of communicating and he had understood how much actual prison time might have resulted, he would have accepted that offer. He denied telling his counsel that he would not take an offer with prison time and asserted that he would have been willing to take an offer with prison time. He stated that he was just interested in obtaining the best offer he could get.

Zimmerman further testified that Corey never talked to him about other cases that were similar to his that resulted in convictions or that it was highly possible that he would be convicted if he went to trial. Although his previous counsel had advised him of the potential consequences of going to trial based on the initial charges, Corey never advised him of the potential sentencing consequences based on the charges upon which he went to trial. But Zimmerman also testified that Corey told him that the highest sentence that he would face was seven years. She never advised him that there was a strong possibility that he would be convicted because she believed they had a good case and that he would be acquitted or the charges dismissed.

*Reference Hearing Findings*

Based on the reference hearing testimony and exhibits,[2] the superior court concluded that the evidence presented at the reference hearing demonstrated on a more probable than not basis that Corey had advised Zimmerman of the third plea offer.

In reaching this conclusion, the superior court acknowledged that the third plea offer was not memorialized in any contemporaneous writing between Corey and Neeb, there was no direct evidence that Corey conveyed the terms of the third offer to Zimmerman, and Zimmerman testified that he never was advised of the terms of the third plea offer. But the court found that other evidence supported the conclusion that Zimmerman had been advised of the terms of the third plea offer on a more probable than not basis.[3] This other evidence included (1) testimony

---

[2] The superior court noted that the only transcripts or exhibits from trial that had been submitted during the reference hearing was the February 2018 sentencing transcript.

[3] The superior court also found that Zimmerman was not lying when he testified that he was not advised of the terms of the third plea offer but that Zimmerman's recollection was not accurate, likely because he was focused on caring for himself and his wife and all of his counsel had advised him that it was possible that he could plea of 12 months or less.

18

demonstrating that Corey was aware of her duty to advise her client of all plea offers and that it was her practice to do so; (2) Neeb's reference to the third plea offer in his post-trial/presentencing email with Corey; (3) Proctor's letter referring to a third offer that was in line with the third offer; and (4) Neeb's testimony that he discussed the third plea offer with Corey in the presence of Zimmerman at trial.

The superior court expressly found that Zimmerman's testimony that Corey never conveyed the plea offer to him was not credible.

Regarding whether Corey properly evaluated the evidence against Zimmerman and properly advised him of the likelihood of conviction and potential sentencing consequences, the superior court found that although Corey initially may have adequately advised Zimmerman about the likelihood of conviction, as the case progressed Corey failed to reevaluate her initial position in light of the denial of her various motions and the evidence presented by the State. The court concluded that Corey therefore had failed to properly evaluate the third offer by the time of the half-time motions. The court also found that "Corey downplayed the chance of conviction, at least of the attempted rape charges." Clerk's Papers (CP) (Reference Hr'g) at 11.

But the superior court was unable to determine whether Corey "downplayed [the chance of conviction] to the point of being ineffective," finding that this question was "beyond the ability of [the court] to ascertain, based on this record." CP (Reference Hr'g) at 11. The court also stated that it was "not finding whether Mr. Zimmerman would have accepted the plea offer at the middle of the trial." CP (Reference Hr'g) at 11. The court did not "take a position on whether the offer would have been accepted by Mr. Zimmerman during the trial." CP (Reference Hr'g) at 11.

Regarding whether Zimmerman was properly advised of the potential sentencing consequences, the superior court found that Zimmerman had been "adequately apprised of the sentencing consequences" by all three of his counsel. CP (Reference Hr'g) at 11.

After the superior court filed its written findings of fact and conclusions of law, the parties submitted supplemental briefing in which they challenge some of the court's findings of fact and conclusions of law.

ANALYSIS

A.    PRP PRINCIPLES

To prevail in a PRP, the petitioner must establish by a preponderance of the evidence (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018). Establishing "actual and substantial prejudice" means more than merely showing the possibility of prejudice; the petitioner must establish that if the alleged error had not occurred, the outcome more likely than not would have been different. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P.3d 978 (2019).

RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to support the factual allegations in the PRP. *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503, 384 P.3d 591 (2016). The petitioner must show that he has competent, admissible evidence to establish facts that would entitle him to relief. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). Conclusory allegations are insufficient. *Wolf*, 196 Wn. App. at 503. In addition, the factual allegations must be based on more than speculation and conjecture. *Yates*, 177 Wn.2d at 18.

The threshold question for an alleged constitutional violation is whether the petitioner has made a prima facie case that a violation occurred and that it resulted in actual prejudice. *Id.* at 17-18. If the petitioner makes at least a prima facie showing but the merits of their contentions cannot be resolved solely on the record, the court should remand for a reference hearing. *Id.* at 18. The reference hearing is used to determine the truth of the petitioner's allegations. *In re Pers. Restraint of Moncada*, 197 Wn. App. 601, 605, 391 P.3d 493 (2017).

In a reference hearing, a personal restraint petitioner has the burden of proving their claims by a preponderance of the evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 679, 101 P.3d 1 (2004). Preponderance of the evidence is equivalent to the "more likely than not" standard. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 409, 972 P.2d 1250 (1999).

We review challenged factual findings from a reference hearing to determine whether the findings are supported by substantial evidence. *In re Pers. Restraint of Reyes*, 21 Wn. App. 2d 353, 374, 505 P.3d 1234 (2022). " 'Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true.' " *Id.* (quoting *Gentry*, 137 Wn.2d at 410). When substantial evidence supports the trial court's findings of fact, we will not disturb those findings even if there is conflicting evidence. *Reyes*, 21 Wn. App. 2d at 374. And the trial court's determination of witness credibility cannot be reviewed on appeal. *Id.*

For an ineffective assistance of counsel claim, we review de novo the legal conclusions flowing from the superior court's findings of fact. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873-74, 16 P.3d 601 (2001).

B.       INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Zimmerman argues that he was denied his right to effective assistance of trial counsel because Corey failed to (1) communicate the State's third plea offer, (2) adequately advise him regarding the third plea offer during course of the trial, (3) engage in good faith plea negotiations, (4) notify him of the potential sentencing consequences and (5) object to the first and second amended informations.  We conclude that all of Zimmerman's ineffective assistance of counsel claims fail.

1.   Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel.  *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021).  To prevail on an ineffective assistance of counsel claim, a petitioner must show both that defense counsel's performance was deficient and that the deficient performance was prejudicial.  *Id*. at 247-48.

Counsel's representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness.  *Id*.  To rebut the strong presumption that counsel's performance was effective, a petitioner bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining counsel's conduct.  *Id*. at 248.

A petitioner's right to effective assistance of counsel extends to plea negotiations.  *State v. Sprague*, 16 Wn. App. 2d 213, 237, 480 P.3d 471 (2021).  This obligation includes communicating all offers.  *State v. Edwards*, 171 Wn. App. 379, 394, 294 P.3d 708 (2012).  The right to effective assistance of counsel also involves " 'assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial.' "  *State v. Estes*, 188 Wn.2d 450, 464, 395 P.3d 1045 (2017) (quoting *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956

(2010)). "Counsel must, at a minimum, 'reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty.' " *Estes*, 188 Wn.2d at 464 (quoting *A.N.J.*, 168 Wn.2d at 111-12).

For ineffective assistance of counsel, prejudice exists if there is a reasonable probability that, except for defense counsel's deficient performance, the result of the proceeding would have been different. *Vazquez*, 198 Wn.2d at 248. In the context of plea negotiations, to establish prejudice "the 'defendant must show the outcome of the plea process would have been different with competent advice.' " *State v. Drath*, 7 Wn. App. 2d 255, 267, 431 P.3d 1098 (2018) (quoting *Lafler v. Cooper*, 566 U.S. 156, 163, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)). The question is whether if defense counsel's performance had not been deficient, there is a reasonable probability that the defendant "would have negotiated a different outcome." *Estes*, 188 Wn.2d at 466. However, "[u]ncertainty about the outcome of plea bargain negotiations should not prevent reversal where confidence in the outcome is undermined." *Id.* at 464.

A petitioner who successfully demonstrates prejudice in an ineffective assistance of counsel claim necessarily has shown actual and substantial prejudice sufficient to obtain collateral relief. *State v. K.A.B.*, 14 Wn. App. 2d 677, 707-08, 475 P.3d 216 (2020).

If defense counsel failed to properly advise the defendant and the plea offer involved pleading guilty to lesser counts, the proper remedy is to remand this matter to the trial court and require the prosecution to reoffer the plea offer at issue. *Drath*, 7 Wn. App. 2d at 270. "The trial court may then exercise its discretion in deciding whether to vacate the trial conviction and accept the plea or leave the conviction undisturbed." *Id.* at 270-71.

2. Failure to Communicate Plea Offer

Zimmerman argues that Corey's performance was deficient because she failed to advise him of the State's third plea offer, and that if she had advised him of this plea offer he would have accepted the offer. We disagree.

As noted above, we ordered a reference hearing on the question of whether Corey communicated the State's third plea offer – a recommendation of 22 to 29 months in confinement – to Zimmerman. Following the reference hearing, the superior court found that Corey had advised Zimmerman of the third plea offer.

Zimmerman challenges this finding, arguing that substantial evidence does not support it. Zimmerman argues that the superior court's finding that Corey advised him of the third plea offer this finding is incorrect because it is inconsistent with Corey's December 3 and 4, 2017 emails to Neeb, in which she indicated that she had no knowledge of the third plea offer.

However, there was contrary evidence. At the reference hearing, Neeb testified that he conveyed the third offer to Corey several times before trial and that he continued to make this offer during the course of the trial, up to the point the State rested its case. Neeb also testified that he discussed this third offer of 22 months in front of Zimmerman five or more times during the State's case in chief. Neeb knew that Zimmerman could hear him because he was reacting to things he said. And Neeb's December 2017 emails to Corey stated that he had presented this offer before trial. In addition, Dummitt testified that it was Corey's practice to convey any offers to her clients.

This evidence supports the superior court's finding that Corey conveyed the third offer to Zimmerman. Accordingly, we reject Zimmerman's challenge to the superior court's finding that Corey conveyed the third plea offer to him. And because Corey conveyed the third plea offer to

24

Zimmerman, we hold that Zimmerman's claim that he received ineffective assistance of counsel based on Corey's failure to advise him of the plea offer fails.

### 3. Failure to Adequately Advise Regarding Plea Offer

Zimmerman argues that Corey's performance was deficient because she failed to adequately advise him regarding the plea offer. We conclude that Zimmerman has failed to satisfy his burden of proof regarding this claim.

#### a. Reference Hearing Findings

Following the reference hearing on this issue, the superior court made the following findings:

61) As noted above, all three attorneys thought there were triable issues. However, by trial, many of those issues, including the probable cause issue, the entrapment issue, and the attempted rape issue, had been decided against the defense or would be after half-time motions.

62) Given that Mr. Neeb testified that he was still talking about the 22-to-29-month offer during trial, which this Court finds credible, at some point this became about the credibility of Mr. Zimmerman.

63) At that point, the 22-to-29-month offer should have been seriously considered or reconsidered by the defense.

64) Though this Court has found that the 22-to-29-month offer was communicated to Mr. Zimmerman in May, the Court finds that it wasn't strongly pushed by Ms. Corey.

65) To be fair, this was May, prior to pretrial motions, and still several months from trial. And given Mr. Zimmerman's concerns over jail time only and his sick wife, he may not have been wiling to take that deal in May, regardless of how hard Ms. Corey pushed. However, by the start of trial and dwindling defense options, it seems, to this Court, that the offer should have been seriously reconsidered.

66) But the evidence shows that, in trial, the contentiousness of the attorneys got to a fever pitch with allegations of misconduct and even motions for dismissal based on misconduct.

67) Mr. Zimmerman stated that they had gone into trial mode at the beginning of summer.

68) Based on Ms. Corey's confidence, her desire to teach Mr. Neeb a lesson, her feelings about the facts of this case, this Court finds that Ms. Corey no longer seriously considered a plea and got ready for trial.

69) Even if she properly evaluated the case prior to trial, *by the time half-time motions were denied*, the evaluation needed to shift to, at least, seriously include taking the 22-to-29-month offer, which, as noted above, appeared to still be available based on Mr. Neeb's testimony.
. . . .

71) Along with the failure to revisit the 22-to-29-month offer, the Court finds that Ms. Corey downplayed the chance of conviction, at least of the attempted rape charges. *Whether downplayed to the point of being ineffective is beyond the ability of this Court to ascertain, based on this record.*
. . . .

75) In conclusion, as to Question 3, the Court finds that, at least, with regard to considering the plea during trial, *especially after half-time motions were denied,* Ms. Corey did not properly evaluate the 22-to-29-month offer.

CP (Reference Hr'g) at 9-11 (emphasis added).

### b. State's Challenge to Findings 69 and 75

The State challenges the superior court's finding in finding of fact 69 that the State's 22 to 29 month offer was still available after Zimmerman's half-time motions were denied and a similar implied finding in finding of fact 75. Accordingly, the State challenges the findings in finding of fact 69 that that Corey should have seriously considered accepting this offer by the time the half-time motions were denied and in finding of fact 75 that "especially after half-time motions were denied, Ms. Corey did not properly evaluate the 22-to-29-month offer." CP (Reference Hr'g) at 11. The State argues that the evidence shows that the 22 to 29 month offer was available only until the State rested its case and was not available after the trial court denied the half-time motions.

The State is correct that the third offer became unavailable before Zimmerman's half-time motions were denied. Neeb testified,

I don't want to make it sound like [negotiations] went all the way through the verdict and after he had testified, because that's not what happened.
. . . .

That situation resolved by about - - I'll say the fourth or fifth day of trial - - because this trial went several weeks. And so *by the time I rested my case, there wasn't going to be any more negotiating*.

RP (Reference Hr'g) at 52 (emphasis added). This testimony was unchallenged. Because the half-time motions were decided after the offer expired, the superior court erred when it found that the plea offer still was available after the half-time motions and that Corey should have reevaluated the offer after the trial court's denial of the half-time motions.

c.  Analysis

The third reference hearing question was whether Corey "properly evaluate[d] the evidence" against Zimmerman and advised him of the likelihood of conviction. Ord. for Reference Hr'g at 2 (June 15, 2023). The superior court stated that "it finds this third question exceedingly difficult, if not impossible, to answer," CP (Reference Hr'g) at 8, with the difficulty being the phrase "properly evaluate the evidence." CP (Reference Hr'g) at 8. Nevertheless, the court attempted to answer the question. CP (Reference Hr'g) at 8.

The superior court found in finding of fact 75 that "with regard to considering the pleas during trial, *especially after half-time motions were denied*, Ms. Corey did not properly evaluate the 22-to-29 month offer." CP (Reference Hr'g) at 11 (emphasis added). But we have concluded above that substantial evidence does not support a finding that the plea offer remained open after the half-time motions were denied and therefore does not support the finding that Corey failed to properly evaluate the offer after the half-time motions.

The superior court did not make a clear finding that Corey was deficient in failing to properly evaluate the 22 to 29 month plea offer before the half-time motions. The court found

27

that the plea offer should have been seriously considered by the start of trial. And the court found that Corey downplayed the chance of conviction. However, the court was unable to ascertain whether this conduct constituted ineffective assistance of counsel. The record reflects only that Corey's prediction regarding the outcome of the trial was incorrect.

The superior court found that Corey did not properly evaluate the offer only after the half-time motions were denied. But as stated above, by that time the plea offer no longer was available.

We emphasize that Zimmerman has the burden of proof on this issue. *Davis*, 152 Wn.2d at 679. In light of the superior court's findings of fact, we conclude that Zimmerman cannot sustain his burden of proving that Corey was ineffective in failing to properly evaluate the plea offer before the half-time motions were denied.

4.    Failure to Engage in Plea Negotiations

Zimmerman argues that Corey failed to engage in good faith plea negotiations due to her difficult relationship with Neeb. We disagree.

Although there is no constitutional right to a plea deal and no per se rule requiring defense counsel to pursue plea negotiations in every case, failure to do so may constitute ineffective assistance if the conduct falls below an objective standard of reasonableness. *State v. Holm*, 91 Wn. App. 429, 437, 957 P.2d 1278 (1998).

Zimmerman argues that plea negotiations were inadequate and hindered by Corey's difficult relationship with Neeb. But the record shows that despite an arguably strained relationship between Corey and Neeb, Corey aggressively pursued plea negotiations with Neeb and his supervisors and that Neeb made plea offers consistent with the offers made in other cases

arising from the sting operation. Although Neeb did not make the exact offer Corey was seeking, his supervisors agreed with his approach.

Because Corey's requested offer was rejected by Neeb's supervisors, we cannot contribute Corey's failure to obtain the exact plea deal she was seeking for her client to her relationship with Neeb. Further, Neeb testified that he and Corey engaged in negotiations multiple times and that Corey consistently pushed the position that Zimmerman did not want any prison time.

Accordingly, we hold that Zimmerman does not establish ineffective assistance of counsel on this ground.

5.    Failure to Adequately Advise of Sentencing Consequences

Zimmerman argues that Corey's performance was deficient because she failed to adequately advise him of the potential sentencing consequences should he lose at trial. We disagree.

Following the reference hearing, the superior court found that Zimmerman had been "adequately apprised of the sentencing consequences" by all three of his counsel. CP (Reference Hr'g) at 11. Zimmerman does not challenge this finding. Because this finding establishes that Zimmerman was adequately advised of the potential sentencing consequences, we hold that this ineffective assistance of counsel claim fails.

6.    Failure to Object to Amended Information

Zimmerman argues that Corey provided ineffective assistance of counsel when she failed to object to the first amended information on vindictive prosecution grounds. He contends that the addition of the felony CMIP charges immediately before trial were in retaliation for his rejecting the plea offers and for retaining Corey as counsel. We disagree.

To establish ineffective assistance of counsel based on defense counsel's failure to object, an appellant must show that the objection would have been sustained. *State v. Crow*, 8 Wn. App. 2d 480, 508-09, 438 P.3d 541 (2019). The question here is whether Zimmerman can show that the trial court would have rejected the motion to amend the information if Corey had objected.

" 'Prosecutorial vindictiveness is [the] intentional filing of a more serious crime in retaliation for a defendant's lawful exercise of a procedural right.' " *State v. Numrigh*, 197 Wn.2d 1, 23, 480 P.3d 376 (2021) (quoting *State v. McKenzie*, 31 Wn. App. 450, 452, 642 P.2d 760 (1981)). To establish prosecutorial vindictiveness, a defendant must show actual vindictiveness or a realistic likelihood of vindictiveness creating a presumption of vindictiveness. *Numrigh*, 197 Wn.2d at 23-24.

A presumption of vindictiveness arises when a defendant can prove that " 'all of the circumstances, when taken together, support a realistic likelihood of vindictiveness.' " *State v. Korum*, 157 Wn.2d 614, 627, 141 P.3d 13 (2006) (quoting *United States v. Meyer*, 810 F.2d 1242, 1246 (1987)). But the mere filing of additional charges after a defendant refuses a guilty plea cannot, without more, does not support a finding of vindictiveness. *Korum*, 157 Wn.2d at 629, 631.

Zimmerman argues that the filing of the first amended information on the day of trial and Neeb's contentious relationship with Corey demonstrates vindictiveness. However, the record does not support this argument.

The record shows that first two plea offers, issued before Corey was counsel, warned Zimmerman that additional charges would be added if the plea offer was rejected. And Neeb specifically warned Thornton in October 2016 that he planned to file additional felony CMIP charges if Zimmerman did not accept the second plea offer.

30

As a result, there is no indication that the State filed the amended information in retaliation for Zimmerman retaining Corey. Nor does the timing of the amendment demonstrate vindictive prosecution because the parties agreed the amended information would be filed when the case went to trial. Further, the second amended information did not add any charges. Instead, it amended the time period of the first felony CMIP charge to conform to the evidence.

Because nothing in the record suggests that the additional felony CMIP charges were vindictive, we hold that Zimmerman does not establish that the trial court would likely have sustained any objection to the first amended information on prosecutorial vindictiveness grounds. Therefore, we hold that Zimmerman fails to establish ineffective assistance of counsel on this ground.

C.     OUTRAGEOUS GOVERNMENT MISCONDUCT

Zimmerman argues that the trial court erred when it denied his pretrial motion to dismiss for outrageous government misconduct. He also argues that newly discovered evidence demonstrates that the government's conduct was more egregious than was known at the time of his motion to dismiss. We disagree.

1.     Legal Principles

We review a trial court's decision on a motion to dismiss for outrageous government conduct for abuse of discretion. *State v. Glant*, 13 Wn. App. 2d 356, 369, 465 P.3d 382 (2020). An abuse of discretion occurs when the court's ruling is "manifestly unreasonable or based on untenable grounds or reasons" and when the court "adopts a view that no reasonable person would take." *Id*.

A trial court can dismiss charges against a defendant based on due process principles if the government has engaged in outrageous conduct. *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d

1035 (1996). To support dismissal on this ground, the government's "conduct must be so shocking that it violates fundamental fairness." *Id*.

However, the circumstances under which dismissal is appropriate are limited:

A due process claim based on outrageous conduct requires more than a mere demonstration of flagrant police conduct. Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity. Dismissal based on outrageous conduct is reserved for only the most egregious circumstances.

*Id*. at 20 (citations omitted).

We evaluate claims of outrageous government conduct based on the totality of the circumstances, addressing the unique set of facts in each case. *Id*. at 21. The focus is on the State's conduct, not on the defendant's predisposition to commit a crime. *Id*. at 22.

The court in *Lively* identified five factors that this court should consider when determining whether government conduct violates due process:

[1] whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; [2] whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation; [3] whether the government controls the criminal activity or simply allows for the criminal activity to occur; [4] whether the police motive was to prevent crime or protect the public; and [5] whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice."

*Id*. at 22 (citations omitted) (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 378 N.E.2d 78, 83 (1978)).

Two published Court of Appeals cases address outrageous government conduct claims relating to undercover operations similar to the one here: *Glant* and *State v. Solomon*, 3 Wn. App. 2d 895, 419 P.3d 436 (2018).

In *Glant*, law enforcement placed a vague Craigslist ad soliciting a man interested in sex with children. 13 Wn. App. 2d at 361. Glant responded, and in texting with a fictional mother of a 13-year-old boy and two girls, aged 11 and 6, expressed an interest in engaging in oral sex with

32

the daughters. *Id*. Glant then drove from Mercer Island to Thurston County to meet the daughters, and he was arrested there. *Id*. at 361-62. After applying the *Lively* factors, the trial court denied Glant's motion to dismiss based on outrageous government conduct and entered extensive findings of fact and conclusions of law. *Id*. at 363.

On appeal, this court evaluated the trial court's analysis of the *Lively* factors, in which the trial court found that (1) the first factor was neutral because although law enforcement posted the Craigslist ad, it was not aimed at Glant specifically and Glant voluntarily responded; (2) the second factor favored the State because the messages as a whole showed that Glant was not reluctant to commit a crime; (3) the third factor was neutral because although law enforcement mentioned children young enough to trigger first degree child rape, Glant controlled which children he made sexually explicit comments about; (4) the fourth factor strongly favored the State because law enforcement's overall motive was to prevent crime and to protect the public; and (5) to the extent law enforcement committed a crime by soliciting sex with a child, that fact did not justify dismissal because the purpose was to prevent crime against actual children. *Id*. at 372-375. This court concluded that the trial court did not err in its analysis of these factors. *Id*. at 375. And this court ultimately held that the trial court did not abuse its discretion in denying the motion to dismiss. *Id*.

In *Solomon*, law enforcement posted an ad in the Craigslist causal encounters section stating that a young woman was looking for sex with a man or a woman. 3 Wn. App. 2d at 898. Solomon responded to the ad, but he said that he would not contact the person again after not hearing back. *Id*. The person then contacted Solomon four days later, but after learning that the person was only 14 years old Solomon twice stated that he was not interested. *Id*. at 899. Despite this, the person continued to send Solomon explicit messages expressing an interest in a

sexual encounter. *Id*. After briefly engaging in sexual conversation, Solomon again rejected the person's advances. *Id*. The trial court found that Solomon attempted to discontinue the conversation seven times, but the person persisted. *Id*. at 913-14. Solomon eventually agreed to meet the person for sex, and was arrested. *Id*. at 901.

The trial court, after considering the totality of the circumstances, granted Solomon's motion to dismiss all charges based on outrageous government conduct. *Id*. at 901, 916. The court entered extensive oral findings of fact, finding that law enforcement (1) instigated the criminal activity by posting the Craigslist ad and messaging Solomon after he discontinued contact, (2) engaged in persistent solicitation that overcame Solomon's reluctance to commit a crime, (3) controlled the criminal conduct by stringing Solomon along over four days of messages, and (4) engaged in conduct that was repugnant to a sense of justice by using graphic and sexualized language to manipulate Solomon. *Id*. at 911-15. Division One affirmed, finding no abuse of discretion. *Id*. at 916.

### 2. No Abuse of Discretion

The trial court expressly analyzed the five *Lively* factors in its written findings. We conclude that the trial court did not abuse its discretion in conducting this analysis and denying the motion to dismiss.

### a. Instigation of the Crime

Regarding the first *Lively* factor, whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity, the trial court made the following finding:

> The defendant posted the ad that began this investigation. His ad's reference to seeking a "young little girl" reasonably suggests the possibility of contact with an underage girl, which is at least potentially criminal, and so the police in this case were infiltrating and not initiating the subject matter at hand.

CP (81032-4-I) at 692.

34

In this case, the analysis of the first factor is distinct from that in both *Glant* and *Solomon* because Zimmerman posted the initial ad rather than law enforcement, and the ad suggested that Zimmerman was seeking contact with an underage girl.

Zimmerman contends that this finding is incorrect because there was no evidence that he was looking to commit a crime by seeking a sexual encounter with a child on an adults-only website prior to being contacted law enforcement. But the website's requirement that users verify they were 18 or older does not necessarily imply that Zimmerman still could not have been seeking out contact with underage girls who might violate the website's age restriction.[4] And the language of the ad stating that he was seeking a "young little girl" suggests that he was seeking contact with underage girls.

In addition, Zimmerman's reaction to learning that "Kaylee" was 13 undermines his assertion that there was no evidence that he was seeking contact with a minor. When "Kaylee" informed Zimmerman that she was 13, Zimmerman did not express surprise or concern, comment on "Kaylee's" young age, or attempt to end the conversation. Instead, his initial response to this revelation was to ask "Kaylee" what she was "looking for" and to request photographs. RP (81032-4-I) at 408-09. Zimmerman later asked "Kaylee" about school, her father, and her sexual experience. Overall, his questions during their exchanges suggest that he believed "Kaylee" was young and that he was concerned about her level of sexual experience and the risks he was taking by being in contact with her – not that he was surprised by the fact a purported 13-year-old child had responded to his ad.

---

[4] Notably, although the website may have had an age restriction, officer Bickford testified that anyone could click on the age verification and the user's true age was never verified.

We hold that the totality of the facts does not support Zimmerman's assertion that there was no evidence that he was seeking contact with a minor. Instead, it supports the trial court's finding that Zimmerman's ad's reference to seeking a "young little girl" reasonably suggested the possibility of contact with an underage girl, which, in turn, supports the trial court's conclusion that law enforcement in this case were infiltrating and not initiating the subject matter at hand.

Based on these facts, we conclude that the trial court did not abuse its discretion when it concluded that the first *Lively* factor weighed in favor of the government.

b.    Overcoming Reluctance by Persistent Solicitation

The second *Lively* factor considers whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation. *Lively*, 130 Wn.2d at 22. The trial court made the following findings related to this factor:

> The court finds the defendant was "cautious" during his communication, and maybe even "reluctant" to do some things, but that reluctance was not focused on engaging with "Kaylee" about sexual matters and meeting up to engage in sexual conduct. There were no pleas to sympathy and no suggestion of profits to be made. While it could be argued the officer persisted in the communications, the text message exchanges as a whole show both sides would be silent and then reinitiate contact with the other over the course of several days, such that the officer could not be said to have been "forcing the issue."

CP (81032-4-I) at 692.

Zimmerman argues that this finding is incorrect because this case is more like *Solomon* than *Glant*. He points to "Kaylee's" repeated invitations to her house despite Zimmerman's rejections of this offer until the date of his arrest. And he contends that "Kaylee" overcame his resistance by repeatedly telling him how sexually available she was.

Zimmerman's argument is unpersuasive. In *Solomon*, the defendant attempted to discontinue the conversation seven times before the party posing as the juvenile convinced

Solomon to meet for sex after barraging Solomon with sexually suggestive language. 3 Wn. App. 2d at 913-14. Here, although there were pauses in the conversation, Zimmerman never attempted to discontinue the conversation, and the pauses were consistent with the normal ebb and flow of an electronic conversation occurring over the course of several days. In addition, Zimmerman, not "Kaylee," initiated the communications on both December 16 and 17. And "Kaylee's" sexual language was consistent with the overall nature and tone of the conversation as a whole.

Although Zimmerman did decline "Kaylee's" initial invitations to come to her house and at first suggested that they meet and go to the park or for a drive or meet in public, this behavior was more consistent with the trial court's characterization of Zimmerman as being "cautious" rather than reluctant. Zimmerman's messages expressed more concern about needing to determine if "Kaylee" was "real or not" before they moved forward than reluctance to meet for sex. RP (81032-4-I) at 458. And once "Kaylee" made it clear that she felt safer meeting him in her home, Zimmerman did not express reluctance about meeting her at her home and they began making plans for him to do so.

Zimmerman also notes that he never arrived at "Kaylee's" house and that he was arrested several blocks away after only discussing a meeting in public. But Zimmerman and "Kaylee" did not just discuss meeting in public. And based on the record as a whole, Zimmerman's failure to arrive at "Kaylee's" house was not for lack of trying, and it did not demonstrate reluctance on Zimmerman's part. He did not arrive at "Kaylee's" house and ultimately sought to meet her in a public place so "Kaylee" could direct him to her house because "Kaylee" initially would not reveal her address and he was then unable to locate the address. And Zimmerman left the area

only after he became concerned because others in the area had observed him lingering in the area and questioned him about his presence.

Based on these facts, we hold that the trial court did not abuse its discretion when it concluded that the second *Lively* factor weighed in favor of the government.

      c.    Control of Criminal Activity

The trial court concluded that the third *Lively* factor, whether the government controls the criminal activity or simply allows for the criminal activity to occur, weighed in favor of the government. The trial court found that law enforcement "did not control the communication or compel the defendant to continue, but rather allowed the crime to occur by the mutual exchange of messages and the eventual 'meeting' almost taking place." CP (81032-4-I) at 692.

Zimmerman argues that law enforcement was in at least as much control of the activities as he was because they led the discussion regarding the sex acts and set up the date, time, and place of meeting. But Zimmerman ignores the fact that he posted the original ad and, apart from "Kaylee's" initial response to the ad in which she inquired what kind of "play" Zimmerman was into, Zimmerman initiated most of the discussions about sex and the possibility of meeting.

Although law enforcement played a role in in developing these discussions over time, the record shows that law enforcement did not direct the conversations into these areas and that they just allowed the criminal activity to occur. And a defendant controls the criminal activity when he chooses to engage with a person he has been informed is a child. *See Glant*, 13 Wn. App. 2d at 373-74.

The record supports the trial court's characterization of the communication. Based on these facts, we hold that the trial court did not abuse its discretion when it concluded that the third *Lively* factor weighed in favor of the government.

d.    Law Enforcement's Motive

The fourth *Lively* factor is whether law enforcement's motive was to prevent crime or protect the public. *Lively*, 130 Wn.2d 22.  The trial court found that law enforcement's "motive during this specific investigation, and during the entire [sting] operation, was to protect the public by preventing sexual crimes against children, and there is no evidence the court could find that suggests any other, or any improper, motive."  CP (81032-4-I) at 693.

Zimmerman argues that the government's motive was to provide publicity for and increase donations to Operation Underground Railroad (OUR), a private organization that donated to MECTF, not to prevent crime or protect the public. *Glant*, 13 Wn. App. 2d at 360. But Zimmerman cannot establish that the trial court abused its discretion because he never presented the court with any evidence or argument regarding OUR's involvement in the sting operations before it decided the motion to dismiss.

The record supports the trial court's characterization of the government's motives.  Based on these facts, we hold that the trial court did not abuse its discretion when it concluded that the fourth *Lively* factor weighed in favor of the government.

e.    Repugnant to Sense of Justice

The fifth *Lively* factor is whether the government conduct itself amounted to criminal activity or conduct repugnant to a sense of justice. *Lively*, 130 Wn.2d 22.  The trial court found "no evidence of 'repugnant' behavior by the police, and based on the Supreme Court's analysis in *Lively*, the officers did not engage in any behavior that 'shocks the conscience' or that suggests any violation of the defendant's due process rights."  CP (81032-4-I) at 693.  The record supports this finding.

Zimmerman argues that the government's conduct was criminal and repugnant to the sense of justice because of the nature of the government's relationship with OUR and the government's duplicity in how it represented this relationship to the courts. But again, Zimmerman did not raise this argument in his motion to dismiss.

We hold that it was not an abuse of discretion for the trial court to not consider this argument We hold that the trial court did not abuse its discretion when it concluded that the fifth *Lively* factor weighed in favor of the government.

f. Summary

We hold that because the trial court did not abuse its discretion in concluding that each of the *Lively* factors weighed in favor of the government, the trial court did not abuse its discretion when it denied Zimmerman's motion to dismiss for outrageous government misconduct.

3. Evidence Not Considered by the Trial Court

Zimmerman also argues that government misconduct can be found based on new information regarding OUR's involvement in the sting operations that demonstrates that the government's conduct was more egregious than previously believed. He contends that this new information demonstrates that law enforcement's true motives were not to prevent crime or to protect the public but to generate crimes and maximize prison time in order to increase press coverage and donations to OUR, and that this fact was withheld from the courts. And he asserts that this conduct was repugnant to the sense of justice.

As noted above, Zimmerman did not present this argument in his motion to dismiss. But because this is a due process issue, he can raise this issue for the first time on collateral review. *See Lively*, 130 Wn.2d at 18-19 (considering a claim of outrageous government conduct raised for the first time on appeal).

This court addressed a similar issue in *Glant*. In *Glant*, this court held that OUR's financial involvement in the sting operations did not demonstrate government misconduct because private funding for the program was statutorily permitted, there was no evidence that OUR was attempting to take over the operations, and any link between OUR funding and Glant's arrest was too attenuated. 13 Wn. App. at 371-72, 374-75.

Zimmerman argues that additional information has come to light that undermines *Glant* because it establishes that OUR plays a more active role in the sting operations than previously acknowledged and that the law enforcement engaged in deceitful conduct in obfuscating this fact.[5] We disagree.

Zimmerman asserts that a mutual support agreement between OUR and the WSP establishes that OUR's funding was contingent on the results of the operations, such as the number of individual arrested, and that OUR's support was to be mentioned in press releases. He contends that these requirements demonstrate that the sting operations were not designed to prevent crime or protect the public, but rather to increase OUR's fundraising efforts. And he further contends that this establishes that the financial arrangement with OUR was repugnant.

The mutual support agreement documents that Zimmerman relies on either are unsigned or only signed by one of the parties to the agreement, so they do not establish that this was the final agreement between OUR and the WSP. But even presuming that this agreement became final, a reporting requirement and acknowledgment of support does not mean that OUR had any

---

[5] Zimmerman also argues that after the arrest, the State's motive "was to score points against defense counsel to further a personal feud." PRP at 57. But the prosecution was well underway before Corey, Zimmerman's third counsel, appeared in this matter. Corey's representation and the State's reaction to her participation in the case is irrelevant to the whether the motivation for the Net Nanny operations was to prevent crime or protect the public.

control or influence over the funded operations or in any way changed the overarching purpose of these operations.

Regarding the claim that law enforcement engaged in deceitful conduct, Zimmerman supports this claim with press releases and news articles. But news releases and articles are hearsay and are not competent, admissible evidence. *Sisley v. Seattle Sch. Dist. No. 1*, 171 Wn. App. 227, 232-33, 286 P.3d 974 (2012). Because this argument is not adequately supported, we do not consider it.

We hold that Zimmerman does not establish that newly discovered evidence demonstrates that law enforcement's motive was not to prevent crime or protect the public or that the WSP sting operation was repugnant to the sense of justice. Accordingly, he does not establish that his charges should be dismissed for outrageous government misconduct.

D.    ENTRAPMENT INSTRUCTION

Zimmerman argues that the trial court erred when it denied his request for an entrapment instruction. \We decline to address this issue because it was raised and addressed on the merits in Zimmerman's direct appeal, and Zimmerman does not establish that the interests of justice require relitigation of this issue.

When pursuing a collateral attack, petitioners are prohibited from renewing issues that were raised and rejected on the merits on direct appeal unless the interests of justice require relitigation of those issues. *Yates*, 177 Wn.2d at 17. The interests of justice are served by reconsidering an issue when there has been an intervening change in the law or some other justification for failing to raise a particular argument earlier. *Id.*

Zimmerman argues that reexamination of this issue is appropriate because *State v. Arbogast*, 199 Wn.2d 356, 506 P.3d 1238 (2022), demonstrates that the rejection of his

entrapment argument on appeal was erroneous. In *Arbogast*, the Supreme Court clarified that to be entitled to an entrapment instruction the defendant only need establish that there was some evidence in support of the instruction, not that the evidence established government inducement and lack of predisposition by a preponderance of the evidence. *Id.* at 370. The court indicated that the preponderance of the evidence standard adopted in *State v. Trujillo*, 75 Wn. App. 913, 919, 883 P.2d 329 (1994), was improper. *Arbogast*, 199 Wn.2d at 372. Zimmerman contends that Division One's rejection of his entrapment instruction argument on direct appeal was the result of confusion about the quantum of evidence necessary to raise the entrapment defense and that this standard has now been clarified by *Arbogast*.

In his direct appeal, Zimmerman argued that the trial court erred when it refused to instruct the jury on the entrapment defense with regard to the felony CMIP offenses. *Zimmerman*, slip op. at 22. The court rejected this argument on two grounds. *Id.*, slip op. at 23.

First, the court noted that in order to be entitled to an entrapment instruction, the defendant must " 'admit facts which, if proved, would constitute [a] crime.' " *Id.*, slip op. at 22 (quoting *State v. Galisia*, 63 Wn. App. 833, 837, 822 P.2d 303 (1992), *abrogated on other grounds by Trujillo*, 75 Wn. App. at 913). The court held that this argument failed because "Zimmerman did not admit to acts that would constitute a crime." *Zimmerman*, slip op. at 23.

Second, the court held that the trial court properly refused to give the entrapment instruction because "the trial court reasonably determined that the evidence supported a finding that the criminal design did not originate in the minds of law enforcement officials" given that Zimmerman created the ad and initiated the sexual conversations. *Id.* However, the court's analysis was based on the preponderance of the evidence standard adopted in *Trujillo*, 75 Wn. at

919, not the some evidence standard that *Arbogast* clarified was proper. *Zimmerman*, slip op. at 22-23.

But *Arbogast* is not relevant to Division One's first ground for rejecting Zimmerman's entrapment instruction argument. And although Zimmerman asserts that this first ground was wrongly decided, he does not direct us to any material facts that previously have not been presented or any change in the law relevant to this ground.

Accordingly, Zimmerman does not demonstrate that the interests of justice requires reexamination of the entrapment instruction issue.

E.      INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Zimmerman argues that he received ineffective assistance of appellate counsel because appellate counsel failed to raise the ineffective assistance of trial counsel and double jeopardy issues addressed above and below. We disagree.

To succeed on an ineffective assistance of appellate counsel claim, a petitioner bears the burden to show that (1) his appellate counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. *In re Pers. Restraint of Salinas*, 189 Wn.2d 747, 759, 408 P.3d 344 (2018). The petitioner also must show that the legal issue that the appellate counsel did not raise had merit and that he actually was prejudiced. *Id*. at 760.

Regarding the ineffective assistance of trial counsel claims, we hold that Zimmerman cannot demonstrate the necessary prejudice because this court has addressed these claims in this PRP.

Regarding the double jeopardy claim, we hold that Zimmerman cannot demonstrate the necessary prejudice because this court is addressing this claim on the merits (below) in this PRP.

Therefore, Zimmerman's ineffective assistance of appellate counsel claims fail.

F.     DOUBLE JEOPARDY – CMIP CONVICTIONS

Zimmerman argues that his four felony CMIP convictions implicate double jeopardy because the four counts constitute a single unit of prosecution. We disagree.

1.     Legal Principles

The Fifth Amendment to the United States Constitution provides that no "person be subject for the same offense to be twice put in jeopardy of life or limb." Article I, section 9 of the Washington Constitution provides, "No person shall . . . be twice put in jeopardy for the same offense." Under these provisions, a defendant can be charged with multiple offenses arising from the same conduct, but double jeopardy prohibits multiple convictions for the same conduct. *State v. Hall*, 168 Wn.2d 726, 729-30, 230 P.3d 1048 (2010). We review double jeopardy claims de novo. *Id.* at 729.

When a defendant has multiple convictions under the same statutory provision, the "unit of prosecution" analysis applies. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d 78 (2014). This analysis asks " 'what act or course of conduct has the Legislature defined as the punishable act.' " *Id.* at 980-81 (quoting *State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998)). In other words, the unit of prosecution analysis "revolves around a question of statutory interpretation and legislative intent." *Adel*, 136 Wn.2d at 634. A unit of prosecution may either be an act or a course of conduct. *Hall*, 168 Wn.2d at 731.

Our approach to analyzing a unit of prosecution issue involves three steps: (1) analyzing the statute, (2) reviewing the statute's history, and (3) performing a factual analysis. *Id.* at 730. The factual analysis is necessary because even after the unit of prosecution is identified, " 'the facts in a particular case may reveal more than one unit of prosecution is present.' " *Id.* (quoting *State v. Varnell*, 162 Wn.2d 165, 168, 170 P.3d 24 (2007)).

45

" 'If the legislature fails to define the unit of prosecution or its intent is unclear, under the rule of lenity any ambiguity must be resolved against turning a single transaction into multiple offenses." *Hall*, 168 Wn.2d at 730 (quoting *State v. Tvedt*, 153 Wn.2d 705, 711, 107 P.3d 728 (2005)). And a " 'unit of prosecution need not be defined by only a single characteristic or element of a crime.' " *Hall*, 168 Wn.2d at 732 (quoting *Tvedt*, 153 Wn.2d at 712).

Zimmermann relies on *Hall*, where the defendant was convicted of three counts of witness tampering. 168 Wn.2d at 729. The convictions were based on over 1,200 telephone calls the defendant made to a witness in which he tried to convince her not to testify or to testify falsely. *Id.* The relevant statute, RCW 9A.72.120(1)(a), stated that a person is guilty of witness tampering if they "attempt[] to induce a witness" to "testify falsely or . . . withhold any testimony." *Id.* at 730-31.

The Supreme Court held under the statute's plain language, the unit of prosecution was the "*ongoing attempt* to persuade a witness not to testify." *Id.* at 734 (emphasis added). The court rejected the notion that each telephone call was a separate offense, which would lead to the absurd result that the defendant could be charged with 1,200 crimes. *Id.* at 737. Therefore, the defendant committed only one offense of witness tampering, not three. *Id.* The court did state that "[o]ur determination might be different if [the defendant] had changed his strategy by, for example, sending letters in addition to phone calls." *Id.* The court expressly did not address the situation where a defendant "employ[s] new and different methods of communication." *Id* at 738.

The State relies on *State v. Ose*, 156 Wn.2d 140, 124 P.3d 635 (2005). In that case, the defendant was convicted of 25 counts of possessing a stolen access device. *Id.* at 143. The relevant statute, RCW 9A.56.160(1)(c), a person is guilty of second degree possession of stolen

46

property if they possessed "a stolen access device." *Id.* The Supreme Court focused on the use of the word "a" before a singular noun. *Id.* at 146. The court stated,

> [B]ecause the word "a" is used only to precede singular nouns except when a plural modifier is interposed, the legislature's use of the word "a" before "stolen access device" unambiguously gives RCW 9A.56.160(1)(c) the plain meaning that possession of each stolen access device is a separate violation of the statute.

*Id.* As a result, the could held that the multiple convictions did not violate double jeopardy. *Id.* at 149.

### 2. Statutory Analysis

Analyzing the unit of prosecution is an issue of statutory construction and legislative intent. *State v. Canter*, 17 Wn. App. 2d 728, 737, 487 P.3d 916 (2021). In determining the legislative intent regarding the unit of prosecution, we look first to the relevant statute's plain meaning. *State v. Madden*, 16 Wn. App. 2d 327, 333, 480 P.3d 1154 (2021). If a word is not defined in the statute, we can consider dictionary definitions to determine the word's ordinary meaning. *State v. Lake*, 13 Wn. App. 2d 773, 777, 466 P.3d 1152 (2020).

Zimmerman was convicted under RCW 9.68A.090, which provides:

> (1) Except as provided in subsection (2) of this section, a person who *communicates* with a minor for immoral purposes, or a person who *communicates* with someone the person believes to be a minor for immoral purposes, is guilty of a gross misdemeanor.

> (2) A person who *communicates* with a minor for immoral purposes is guilty of a class C felony punishable according to chapter 9A.20 RCW . . . if the person *communicates* with a minor or with someone the person believes to be a minor for immoral purposes . . . through the sending of *an electronic communication*.

> (3) For the purposes of this section, "electronic communication" has the same meaning as defined in [RCW 9A.90.120].[6]

---

[6] RCW 9.68A.090(3) actually cites to the definition in former RCW 9.61.260 (2004), which was recodified as RCW 9A.90.120. LAWS OF 2022 ch. 231 §4. RCW 9A.90.120 provides definitions relevant to cyber harassment.

(Emphasis added.)

RCW 9A.90.120(8) provides that " 'electronic communication' means the transmission of information by wire, radio, optical cable, electromagnetic, or other similar means. 'Electronic communication' includes, but is not limited to, email, *internet-based communications*, pager service, and electronic text messaging." (Emphasis added).

Based on the statutory language, the unit of prosecution for felony CMIP is communicating with a minor – or, as in this case, someone the defendant believes is a minor – for immoral purposes through an electronic communication. RCW 9.68A.090(2). Whether this unit of prosecution refers to each individual contact or a course of conduct depends on the interpretation of the terms "communicates" and "an electronic communication."

RCW 9.68A.090(2) does not define "communicates." But the use of the verb "communicates" rather than the singular noun "a communication" as in *Ose* suggests that the term could encompass multiple contacts. And the dictionary definition of communicate is "to send information or messages *sometimes back and forth*: speak, gesticulate, or write to another to convey information: interchange thoughts." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 460 (2002) (emphasis added). Under this definition, "communicates" could refer either to a single contact or to multiple "back and forth" contacts.

The other key term is in the last sentence of RCW 9.68A.090(2), which refers to "the sending of *an* electronic communication." The State focuses on this language, and argues that under *Ose* the use of the word "an" before a singular noun means that each contact is a separate offense. However, that portion of the statute relates to the classification of the offense as a felony, not whether the substantive offense of communication with a minor for immoral purposes occurred. Further, the definition of "electronic communication" in RCW 9A.90.120(8) includes

"internet-based communication*s*."  (Emphasis added.)  So that term is not necessarily limited to an individual contact.  As a result, the legislative intent in the use of "*an* electronic communication" is not as clear as in *Ose*.

We also note that identifying each email or text message as a separate unit of prosecution could result in Zimmerman being charged with over 364 offenses.  That would be an absurd result.  *See Hall*, 168 Wn.2d at 737.

Based on an analysis of the statutory language, the unit of prosecution under RCW 9.68A.090(2) could include either single contact or a continuing course of conduct.  This means that the legislative intent is unclear, and we must apply the rule of lenity.  *See Hall*, 168 Wn.2d at 730.  Therefore, we conclude that the unit of prosecution for CMIP can include a course of conduct involving multiple contacts.

3.    Statute's History

We next examine the statute's history.  The language of the offense of communicating with a minor for immoral purposes has remained relatively unchanged over time, although the offense has been codified under different chapters.  *See* 13B Seth A. Fine and Douglas J. Ende, WASHINGTON PRACTICE CRIMINAL LAW WITH SENTENCING FORMS, Part II, sec. 2503 (2002) ("The substance of the offense of communicating with a minor has remained remarkably stable, though it has a checkered codification history.").  None of the amendments to what is now codified as RCW 9.68A.090 provide any assistance in determining the meaning of "communicates."

In 2006, the legislature added the phrase "or if the person communicates with a minor or with someone the person believes to be a minor for immoral purposes, including the purchase or sale of commercial sex acts and sex trafficking, through the sending of an electronic

49

communication" to RCW 9.68.090(2). Laws of 2006, ch. 139, § 1. But as discussed above, the reference to "an electronic communication" does not unambiguously indicate that the unit of prosecution is limited to each separate contact.

Therefore, the legislative history does not compel a different result than the statutory analysis.

4.   Factual Analysis

Determining that the unit of prosecution for CMIP can include a course of conduct involving multiple contacts does not end our analysis. The final step is to perform a factual analysis as to the unit of prosecution. As noted above, " 'the facts in a particular case may reveal more than one unit of prosecution is present.' " *Hall*, 168 Wn.2d at 730 (quoting *Varnell*, 162 Wn.2d at 168). Once the unit of prosecution is identified, the specific facts of each case will determine the number of units of prosecution.

a.   Email Communications

Count II related to email exchanges between Zimmerman and "Kaylee" starting on December 14. Counts III through V related to the text messages Zimmerman sent to "Kaylee" on December 15 to December 17. All of Zimmerman's emails were sent before he started texting "Kaylee" on December 15; only "Kaylee" sent emails after that date.

Although both emails and text messages are electronic communications, they represented different methods of communicating. This is the situation that the court in *Hall* declined to address: a defendant who "employ[s] new and different methods of communications." 168 Wn.2d at 738.

Zimmerman initiated his contact with "Kaylee" using email. He then switched to text messages. Although the purpose of the communications may have been the same, emails and

text messages cannot be considered part of the same course of conduct because Zimmerman's methods changed. We conclude that the use of different methods of communication represents separate units of prosecution. Accordingly, the conviction on Count II does not violate double jeopardy despite the convictions on Counts III-V.

        b.    Text Messages

Counts III-V related to text messages Zimmerman sent on December 15, 16, and 17 respectively. Zimmerman and "Kaylee" exchanged multiple text messages between 10:24 am on December 15 and 1:19 am on December 16. There then was a 10 hour gap before Zimmerman texted "Kaylee" at 11:10 am on December 16. They exchanged multiple text messages on that day until 9:57 pm. There then was a 12 hour gap until Zimmerman texted "Kaylee" at 10:15 on December 17. They exchanged multiple text messages on that day until Zimmerman was arrested.

The exchange of multiple text messages certainly can constitute a course of conduct that represents a single unit of prosecution. But when the parties disengage for an extended period after a series of communication, the course of conduct – and the unit of prosecution – necessarily ends. A new course of conduct and a new unit of prosecution begins when the parties reinitiate contact. In other words, each separate engagement constitutes a separate unit of prosecution.

Zimmerman and "Kaylee" exchanged multiple texts on December 15, but then disengaged for 10 hours. Zimmerman reinitiated contact 10 hours later. They exchanged multiple texts on December 16, but then disengaged again. Zimmerman reinitiated contact 12 hours later, and they exchanged multiple texts on December 17. Each day represented a separate engagement. Therefore, we conclude that Zimmerman's text messages to "Kaylee" constituted three units of prosecution.

Accordingly, we hold that the convictions on Counts III-V do not violate double jeopardy.

CONCLUSION

We deny Zimmerman's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
VELJACIC, A.C.J.

_____
PRICE, J.